# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MANUEL OYOLA, *an individual, and on behalf of all others similarly situated*,<br><br>        *Plaintiff,*<br><br>    v.<br><br>LAFAYETTE FEDERAL CREDIT UNION,<br><br>        *Defendant.* | Case No. 8:25-cv-03410-DLB<br><br>Related No. 8:25-cv-01006-DLB (In re Lafayette Federal Credit Union Data Breach Litigation) |

## <u>DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND</u>

Defendant Lafayette Federal Credit Union ("Lafayette") respectfully opposes Plaintiff Manuel Oyola's ("Oyola") Motion to Remand ("Motion"). (Doc. 10).

## INTRODUCTION

This putative class action arises from a data incident where an unauthorized person briefly accessed an email account belonging to one of Lafayette's employees. Oyola, the named plaintiff, purports to represent a nationwide class of over 70,000 people who were allegedly impacted. It is undisputed that this case arises from the same data incident at the heart of a Consolidated Action (as defined in the Motion) long-pending before this Court. It is also undisputed that the Consolidated Action asserts nearly identical factual allegations against the same defendant on behalf of the same putative class alleging the same injuries and raising overlapping claims. Lafayette removed this latest class action from Maryland state court under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), so that it could be consolidated with the others, thereby promoting efficiency, consistency, and convenience.

Several months ago, Lafayette filed a motion to dismiss the Consolidated Action for lack of Article III standing, and the plaintiffs responded with a motion to amend their complaint in which they claim standing to seek the same relief as Oyola does here. Both motions are still pending. Even though this action and the Consolidated Action are at the pleadings stage, Oyola objected to consolidation (which remains pending) and now moves to remand based primarily on his lack of Article III standing. As standing is an overlapping, threshold issue that must be resolved in both this case and the Consolidated Action, Lafayette respectfully requests that the Court defer ruling on Oyola's motion to remand until it resolves the issue of standing in the Consolidated Action.

## BACKGROUND

Oyola filed this putative class action in Maryland state court, asserting claims arising from a data incident that occurred on September 16, 2024, where an unauthorized person briefly accessed an email account belonging to one of Lafayette's employees ("Data Incident"). (Doc. 1, p. 2; Doc. 1-2, p. 11). He claims that his sensitive personal information was exposed during the Data Incident as a result of Lafayette's alleged failure to properly safeguard the data in its possession. (Doc. 1, p. 2; Doc. 1-2, pp. 13–14). On behalf of a proposed class of "over 70,000 individuals," defined as "[a]ll persons whose Personal Information was maintained by Lafayette and accessed or acquired without authorization during the cybersecurity incident," Oyola raises a common law negligence claim, as well as claims under the Maryland Personal Information Privacy Act, Md. Code Ann., Com. Law §§ 14-3501 *et seq.*, and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.* (Doc. 1, p. 2; Doc. 1-2, pp. 17–18, 24–31).

Lafayette timely removed this case on October 15, 2025. (Doc. 1). It is undisputed that this case involves the same Data Incident and shares the same core allegations, including the overall

class definition, as five other actions this Court has consolidated under the caption *In re Lafayette Federal Credit Union Data Breach Litigation*, Master File No. 8:25-cv-01006-DLB. *See* Order Granting Plaintiffs' Motion to Consolidate and Appoint Interim Class Counsel, *Lewis v. Lafayette Federal Credit Union*, No. 8:25-cv-01006-DLB (D. Md. May 16, 2025), ECF No. 13. As Oyola admits in his Motion, "the events giving rise to the Consolidated Action are the same September 16, 2024, data breach and March 20, 2025, notice letter at issue in this case." (Doc. 10, p. 3). Consistent with Lafayette's allegations in its Notice of Removal, plaintiffs in the Consolidated Action allege that the Court has subject-matter jurisdiction under CAFA, 28 U.S.C. § 1332(d), because the parties are minimally diverse, the putative class includes more than 100 members, and the amount in controversy exceeds $5 million. (Consolidated Action, ECF No. 23 ¶ 8; Doc. 1, pp. 3–9).

In the Consolidated Action, Lafayette has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6) for lack of standing and failure to state a claim, respectively. Consolidated Action, ECF No. 29. Instead of litigating Lafayette's motion to dismiss, plaintiffs filed a motion to amend their complaint, seeking to bolster their injury-in-fact allegations and voluntarily dismiss one of their claims. Consolidated Action, ECF No. 30. Importantly, plaintiffs insist that they have Article III standing. Consolidated Action, ECF No. 32. Lafayette has opposed their motion on the ground that the proposed amendments are futile. Consolidated Action, ECF No. 31. Both the motion to dismiss and the motion to amend are still pending.

Despite the fact that this case is nearly identical to the Consolidated Action and is also at the pleadings stage, Oyola objected to consolidation (Doc. 7) and now moves to remand (Doc. 10). Lafayette strongly supports consolidation (Doc. 9) and hereby opposes Oyola's motion to remand.

**ARGUMENT**

**1. The Court Should Defer Ruling on Oyola's Motion to Remand Until It Resolves the Issue of Standing in the Consolidated Action.**

There is no dispute that this action and the Consolidated Action arise from the same Data Incident, assert nearly identical factual allegations, and purport to represent the exact same class. Indeed, Oyola's alleged harms are almost carbon copies of those asserted in the Consolidated Action.[1] Yet the plaintiffs in the Consolidated Action insist Article III standing is "certainly" demonstrated on the face of their complaint (Consolidated Action, ECF No. 32, pp. 2–3), while Oyola contends these same allegations are insufficient to invoke this Court's jurisdiction. For its part, Lafayette maintains that all plaintiffs lack Article III standing—as no plaintiff has incurred any injury-in-fact traceable to the Data Incident—but it also acknowledges that plaintiffs' contrary position in the Consolidated Action creates an open issue of law for this Court to decide.

The injury-in-fact element in data-breach cases is an evolving area of law that has resulted in numerous circuit splits. *See, e.g.*, Caleb A. Johnson, *Data Breach Class Actions: How Article III Standing Analysis Should Evolve After TransUnion, LLC v. Ramirez*, 107 Minn. L. Rev. 2249,

---

[1] *Compare* Doc. 1-2, pp. 14–17 (alleging that Oyola and the class have sustained or will sustain "economic loss," "theft of their Personal Information," "publication of their Personal Information to the Dark Web," "diminution in value of their Personal Information," "costs associated with attempting to ameliorate, mitigate, and deal with the actual and future consequences of the breach," "loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the breach," "money and time to prevent, detect, contest, and repair identity theft, fraud, and other unauthorized uses of their Personal Information," "continued risk of exposure to hackers and thieves of their information," emotional distress and anxiety, among other harms), *with* Doc. 1-3, p. 3 ("Plaintiffs and Class members suffered concrete injuries in fact including, but not limited to: (i) lost time, productivity, and opportunity costs associated with attempting to mitigate the actual and future consequences of the Data Breach . . . ; (ii) invasion of their privacy; (iii) theft of their PII; (iv) lost or diminished value of their PII; (v) loss of benefit of the bargain; (vi) nominal damages; (vii) the continued and certainly increased risk to cybercriminals accessing their PII . . . ; and (viii) suffering from fear, anxiety, and stress associated with constantly having to monitor personal banking and credit accounts due to their PII now being in the hands of cybercriminals.").

2261 n.90 (2023) ("Federal courts across the country are not close to reaching a consensus in the hotly contested area of Article III standing in cyber-breach cases." (quoting Marcello Antonucci, Jana Landon, Chad Layton & Darin McMullen, *Article III Standing in Cyber-Breach Litigation*, Brief, Summer 2019, at 42)). Circuits disagree about whether there are even splits in the first place. *See, e.g.*, *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021) (disagreeing with the scope of the split identified by the Fourth Circuit in *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017)). Meanwhile, secondary sources disagree over whether the Fourth Circuit takes a narrow or middle-ground view of harm required to establish standing. *Compare* Caroline Ribet, *Don't Just Do Something, Stand There: What Criminal Law Teaches Us About Article III Standing in Data Breach Cases*, 172 U. Pa. L. Rev. 257, 268 (2023) (opining that the Fourth Circuit has "carved out something of a middle ground"), *with* Kayla M. O'Brien, *Health Is Wealth: Strengthening Plaintiffs' Ability to Confer Standing in Health Information Data Breach Cases*, 74 Emory L.J. 963, 977 (2025) ("The Fourth Circuit's analysis in *Beck* exemplifies how the narrow approach to injury-in-fact has been applied to data breach cases involving health information."). And hot off the presses is a published Fourth Circuit opinion on standing in a data-breach case, where the court ruled that a small subset of plaintiffs had sufficiently alleged one injury-in-fact. *See Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 419 (4th Cir. 2025) (affirming in part and reversing in part the district court's dismissal for lack of standing). This decision was issued on October 14—one day before Lafayette filed its Notice of Removal.

Against this backdrop, Lafayette cannot predict with certainty whether the Consolidated Action will be dismissed for lack of standing.[2] So when Oyola filed this case in state court,

---

[2] Though, as set forth in Lafayette's opposition to the plaintiffs' motion to amend their consolidated complaint, the proposed additional allegations in no way solve the plaintiffs' failure to allege an injury-in-fact in the Consolidated Action, and any amendment is therefore futile. ECF No. 31.

Lafayette had two options: (1) leave Oyola's case in state court because Lafayette *predicts* that this Court will find he lacks standing, but run the risk of being wrong, resulting in the costs, inefficiencies, and inconsistencies that come from litigating the exact same putative class action in two different courts; or (2) remove the case and ask this Court to decide whether it has jurisdiction across all actions. Lafayette chose the latter, as nothing requires a party to forego removal "simply because they *think* they *might* have a meritorious standing argument." *Ladies Mem'l Ass'n Inc. v. City of Pensacola*, 662 F. Supp. 3d 1212, 1218 (N.D. Fla. 2023).

Much of the authority Oyola cites is irrelevant or misapplied. *Gorney v. Hellers Gas Maryland Inc.*, for example, stands for the unremarkable proposition that a case should be remanded if the court concludes that the plaintiff lacks standing. Order Granting Plaintiff's Motion to Remand, 24-cv-00146-GMG (N.D. W. Va. Jan. 30, 2025), ECF No. 123 at 4–5.[3] That standing is a threshold issue, however, is not in dispute. Oyola also mistakenly asserts that, for purposes of removal, the proponent of standing must demonstrate an "injury in fact to each proposed class member"—all 70,000-plus of them. (Doc. 10, pp. 8–9). That is simply wrong. *See Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778–79 (4th Cir. 2023); *Wilson v. Eagle Nat'l Bank,* No. 20-cv-01344-JRR, 2023 WL 2478933, at *9 (D. Md. Mar. 13, 2023) (contextualizing the sentence from *TransUnion* that Oyola relies on and reiterating that in a class action, standing focuses on the named plaintiffs at the pleadings stage).

The parties agree: standing is a threshold issue in both this case and the Consolidated Action that must be resolved first. *See, e.g.*, *Palmetto Automatic Sprinkler Co. v. Smith Cooper*

---

[3] Oyola also suggests that the standing defect in *Gorney* somehow tainted the amount in controversy there, too (Doc. 10, pp. 9–10). Again, that is incorrect: the court in *Gorney* did not evaluate the amount in controversy because it had already identified a threshold defect—lack of standing.

*Int'l, Inc.*, 995 F. Supp. 2d 492, 495 (D.S.C. 2014) (explaining that "parties cannot stipulate to questions of federal subject matter jurisdiction," so even where a defendant does not contest a ground to remand, a "court must still consider whether remand is appropriate"); *accord Quinones v. Nat'l Amusements, Inc.*, No. 07-cv-663-MHD, 2007 WL 1522621, at *2 & n.4 (S.D.N.Y. May 21, 2007) (stating parties cannot "stipulate to a lack of jurisdiction"). Where, as here, the injuries alleged across actions is identical (*see supra* note 1), there is no cause to decide the sufficiency of the same in piecemeal fashion. This is particularly true where, as here, the plaintiffs are all on the same procedural footing, and thus there can be no prejudice to Oyola in deferring a ruling on his Motion to Remand in favor of resolving the issue of standing in the Consolidated Action.

## 2. CAFA Jurisdiction Is Otherwise Appropriate.

Setting aside standing, Oyola also argues that this Court should refrain from asserting jurisdiction under CAFA because (a) it is doubtful he can recover the class-wide relief requested; and (b) he speculates, and wishes, that the class composition were different. Lafayette agrees that this case should be remanded if the Court dismisses the Consolidated Action for lack of standing, so it is premature to resolve these CAFA issues until the Court rules on Lafayette's motion to dismiss the Consolidated Action. Regardless, and as set forth in its removal papers and below, this Court has jurisdiction over this action under CAFA.

### a. The Amount in Controversy Easily Exceeds $5 Million.

This Court has original jurisdiction over this action under CAFA because (1) at least one member of the putative class and Lafayette are citizens of different States (Doc. 1, pp. 3–4); (2) the putative class has 100 or more members (Doc. 1, p. 4); and (3) the amount in controversy exceeds $5 million (Doc. 1, pp. 5–9). *See Monaco v. WV Parkways Auth.*, 57 F.4th 185, 189 n.3 (4th Cir. 2023) ("The requirements for original jurisdiction under the Class Action Fairness Act

are minimum diversity, $5 million in controversy, and a class of more than 100 members."). Oyola only contests the amount-in-controversy requirement. His arguments, however, are misplaced.

Under CAFA, the "matter in controversy [must] exceed[] the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2). "[T]o determine whether the matter in controversy exceeds the sum or value of $5,000,000," courts aggregate the "claims of the individual class members." *Id.* § 1332(d)(6); *see also Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) ("[Section 1332] tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [plaintiff's] proposed class and determine whether the resulting sum exceeds $5 million."). The "key inquiry" is "not what the plaintiff will actually recover but an estimate of the amount that will be put at issue in the course of the litigation." *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 196 (4th Cir. 2017) (citation omitted). Here, Oyola purports to represent a class of over 77,337 members, meaning that Lafayette needs to show that each member's claims "puts at issue" at least $64.66 to clear CAFA's jurisdictional threshold. (Doc. 1-2, p. 13; Doc. 10, p. 2).

Oyola alleges a laundry list of class-wide "losses and damages," including emotional distress, mitigation expenses, the loss of personal information and the diminution of its value, increased risk of identity theft and fraud, publication of personal information on the Dark Web, and "costs from the purchase of credit monitoring and identity theft protection services." (Doc. 1, pp. 5–7; Doc. 1-2, pp. 14–17). In its Notice of Removal, Lafayette demonstrated that a damages award for even one of these alleged losses easily exceeds $5 million. (Doc. 1, p. 7). Specifically, Lafayette cited a website showing that the cost of basic identity theft protection for just one year is $124.99. (Doc. 1, p. 7 (citing *Select Your Plan*, LifeLock, https://lifelock.norton.com)). This is consistent with guidance from the Consumer Financial Protection Bureau (CFPB), which verified

only a few months ago that the "cost of identity monitoring services varies from as little as a few dollars a month to over $15 per month." *See What Is Identity Monitoring or "Identity Theft" Service?*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/ask-cfpb/what-is-identity-monitoring-or-identity-theft-service-en-1369/ (last reviewed Sept. 5, 2025). $124.99 multiplied across a proposed class of 70,000 is almost $8,750,000. Even if the cost of these services is only $9 per month—the midpoint of CFPB's range—that still exceeds $5 million ($9 per month times 12 months multiplied by 70,000 equals $7,560,000).

Oyola also seeks injunctive relief, which "must be valued in determining whether the plaintiff has alleged a sufficient amount in controversy." *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010). Courts "ascertain the value of an injunction . . . by reference to the larger of two figures: the injunction's worth to the plaintiff or its cost to the defendant." *Id.* Lafayette noted in its Notice of Removal that Oyola seeks injunctive relief "correcting [its] alleged 'failure to properly secure the Personal Information of class members.'" (Doc. 1, p. 7 (citing Compl. ¶¶ 1, 100, 118; Prayer for Relief)). Injunctive relief requiring Lafayette to *permanently* increase its already high spending on data security—including additional risk assessment, compliance audits, security technology, and training—would cost millions of dollars. (Doc. 1, p. 7); *see How Much Does Cyber Security Really Cost*, Framework Security (May 2, 2025, https://frameworksecurity.com/post/how-much-does-cybersecurity-really-cost) (stating that "[m]id-sized companies may spend $100,000–$500,000, while enterprise organizations often invest millions" annually in cyber security); *Under the Microscope: Security Costs*, NCX Group, https://ncxgroup.com/2021/08/cybersecurity-costs-under-the-microscope/ (stating that mid-sized businesses spend between "$500,000 and $2 million . . . on cybersecurity per year" and large businesses spend between "$2 million and $5 million").

Oyola deliberately ignores these concrete examples, effectively conceding the point. "When only one party submits evidence," like here, the Court "accept[s] it as uncontroverted" and simply "test[s] whether the responsible party has met its burden." *Scott*, 865 F.3d at 196 n.5. But even if controverted (they are not), the Court can take judicial notice of the costs stated in the websites above, as they are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).[4] At the very least, Oyola cannot possibly dispute the accuracy and authenticity of the CFPB's website, which proves that the amount in controversy exceeds $5 million. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites."). The costs set out in the websites above may be judicially noticed and readily satisfy Lafayette's burden to show that more than $5 million will be put at issue in this case.

Oyola nonetheless asserts that Lafayette's Notice of Removal "should be viewed as critically deficient" because it includes "no evidence that the $5 million threshold is likely to be crossed here." (Doc. 10, p.13). To start, Lafayette's Notice of Removal included some of the websites cited above, which may be judicially noticed under the Federal Rules of Evidence. Regardless, it is blackletter law that a notice of removal "need not contain evidentiary submissions." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014); *accord*

---

[4] *See also Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 227 (4th Cir. 2013) (stating courts "may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute"); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); *Adewol v. TGINESIS LLC*, No. 23-cv-00509-GLR, 2024 WL 3362434, at *5 n.8 (D. Md. July 10, 2024) (taking judicial notice of product information on Ulta Beauty's website), *aff'd*, No. 24-1753, 2025 WL 1672859 (4th Cir. June 13, 2025).

*Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008) (stating a "removing party's notice of removal sufficiently establish[es] jurisdictional grounds for removal by making jurisdictional allegations in the same manner" as a complaint)*; Acad. of Country Music v. Cont'l Cas. Co.*, 991 F.3d 1059, 1068 (9th Cir. 2021) ("[A] notice of removal need not contain evidentiary submissions but only plausible allegations of the jurisdictional elements." (cleaned up)). Evidence is required "only when the plaintiff contests, or the court questions, the defendant's allegation[s]," *Dart*, 574 U.S. at 89; *accord Ellenburg*, 519 F.3d at 200.

Oyola also faults Lafayette for measuring the amount in controversy by aggregating the requested remedies instead of aggregating only the "*actual* damages suffered by Plaintiffs." (Doc. 10, p. 12). But "it is settled that the test for determining the amount in controversy . . . is the *pecuniary result* to either party," *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002) (emphasis added), which includes not only actual damages but also other forms of damages, injunctive relief, and attorneys' fees, *see JTH Tax*, 624 F.3d at 639 (stating "like requests for money damages, requests for injunctive relief must be valued in determining whether the plaintiff has alleged a sufficient amount in controversy" and aggregating the "money damages" and "requested injunctive relief" to test whether the jurisdictional threshold was met). *See also Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 416 (9th Cir. 2018) ("The amount in controversy may include damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes." (cleaned up)).

Finally, Oyola's authority is plainly distinguishable. (Doc. 10, p. 14 (relying on *Sikes v. Sree Hotels, LLC*, No. 3:24-cv-00679-KDB, 2024 WL 5130865 (W.D.N.C. Dec. 16, 2024), and *Crawford v. thyssenkrupp Materials NA*, No. 4:21-cv-390-MTS, 2021 WL 4843957 (E.D. Mo. Oct. 18, 2021)). *Sikes* ruled that there were "insufficient factual allegations" to support the amount-

in-controversy requirement because there were "no factual allegations in the [complaint] that suggest how much in actual damages Plaintiff or the putative class members might be entitled to receive if their claims are successful (e.g., the cost of credit monitoring, etc.)." *Sikes*, 2024 WL 5130865, at *6. Lafayette has provided exactly what was missing in *Sikes*—factual allegations about how much the proposed class members may be entitled to receive, such as the cost of identity protection services. And in *Crawford*, the defendants rested on their self-proclaimed "inescapable conclusion from the allegations in the Complaint and the relief sought" that the amount in controversy exceeded $5 million without offering even "one shred of evidence." *Crawford*, 2021 WL 4843957, at *2. Again, that is not the case here.

**b. No CAFA Abstention Applies, and Oyola Has Provided No Basis for Jurisdictional Discovery.**

CAFA's "goal" is to "keep interstate actions in federal court and truly intrastate actions in the state courts." *Skyline Tower Painting, Inc. v. Goldberg*, 148 F.4th 209, 226 (4th Cir. 2025) (cleaned up). So even when a district court has original jurisdiction under CAFA, "it can—or must—abstain from exercising that jurisdiction in certain circumstances." *Id.* at 220. As the "party seeking remand," Oyola "has the burden of proving that one of CAFA's three exceptions to removal applies." *Dominion Energy, Inc. v. City of Warren Police & Fire Ret. Sys.*, 928 F.3d 325, 336 (4th Cir. 2019).

The three grounds for abstention are (1) the discretionary exception, (2) the local-controversy exception, and (3) the home-state exception. A court "*may* decline to exercise CAFA jurisdiction" under the "discretionary exception," *Skyline*, 148 F.4th at 220, which applies when "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes . . . and the primary defendants are citizens of the State in which the action was originally filed," 28 U.S.C. § 1332(d)(3). If the discretionary exception's citizenship threshold is met, six statutory

considerations then guide the court's decision of whether to abstain from exercising jurisdiction. *See id.* § 1332(d)(3)(A)–(F). By contrast, a court "*shall* decline to exercise CAFA jurisdiction" when either the "local-controversy exception" or the "home-state exception" applies. *Skyline*, 148 F.4th at 220; § 1332(d)(4)(A)–(B). Both of these exceptions require that more than "two-thirds" of the proposed class "are citizens of the State in which the action was originally filed." § 1332(d)(4)(A)–(B). So none of the exceptions is in play unless the class is comprised of at least one-third Marylanders.

Oyola invokes all three exceptions (Doc. 1, pp. 16–19), but each fails off the bat because Marylanders make up only about 20% of the proposed class. The class is defined as "All persons whose Personal Information was maintained by Lafayette and accessed or acquired without authorization during the cybersecurity incident described herein." (Doc. 1-2, p. 17). Consistent with Oyola's allegation that Lafayette mailed notice of the Data Incident to 77,337 people (Doc. 1-2, p. 13), Lafayette's records reflect that 15,585 of the 77,337 notices were sent to individuals with Maryland addresses—approximately 20% of the proposed class. (Ex. A ¶ 5, Decl. of Serena Carrion). The names of those individuals were run through the USPS National Change of Address database to ensure that their addresses were accurate. (*Id.* ¶ 4); *see Skyline*, 148 F.4th at 225–27 (holding that "residency suffices to create a rebuttable presumption of citizenship" and citing favorably *Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1223 (9th Cir. 2020)); *Adams*, 958 F.3d at 1223 (ruling that "evidence showing that more than 90% of class members had last known mailing addresses in California" sufficed to show that more than one-third of the class members were citizens of California). 20% is nowhere close to the citizenship threshold to qualify for any of the CAFA exceptions, so none is even in play.

More still, the fact that other class actions have been filed within the last three years asserting similar allegations and claims against the same defendant on behalf of the same class blocks the local-controversy exception entirely, § 1332(d)(4)(A)(ii), and strongly militates against exercising discretion to abstain, § 1332(d)(3)(F). One of the local-controversy exception's elements is that, "during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." § 1332(d)(4)(A)(ii). Oyola completely ignores this hurdle (Doc. 10, pp. 16–17), likely because he cannot seriously dispute that the Consolidated Action "assert[s] the same or similar factual allegations against" Lafayette on behalf of the same class. The local-controversy exception thus fails twice over. *See Dutcher v. Matheson*, 840 F.3d 1183, 1191 (10th Cir. 2016) (noting that "[a]ll four prongs must be satisfied"); *see also Vodenichar v. Halcón Energy Props.*, 733 F.3d 497, 508 (3d Cir. 2013) ("Congress wanted to ensure that defendants did not face copycat, or near copycat, suits in multiple forums and hence excluded from the local controversy exception cases where a defendant was named in multiple similar cases.").

Similarly, one of the six statutory considerations that guides abstention under the discretionary exception is "whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed." § 1332(d)(3)(F). Oyola asserts that "this matter is distinct from the Consolidated Action" because the Consolidated Action "draws upon the FTC Act for its causes of action, while Mr. Oyola draws strictly upon state law." (Doc. 10, p. 19). But both this case and the Consolidated Action bring the same lead cause of action under the same theory—common-law negligence for Lafayette's alleged failure to properly safeguard the putative class members' personal information. (Doc. 1-2, pp. 24–28; Doc. 1-3, pp. 43–47). The fact that the Consolidated

14

Action weaves in some allegations about Lafayette's failure to comply with federal law makes no difference. The "purpose" of the factor "is efficiency and fairness: to determine whether a matter should be subject to federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions." *Speed v. JMA Energy Co., LLC*, 872 F.3d 1122, 1137 (10th Cir. 2017) (quoting S. Rep. No. 109-14, at 38). Where, as here, "other class actions involving the same subject matter ha[ve] been filed elsewhere, this [consideration] strongly favor[s] federal jurisdiction." *Id.*

Turning to the remaining five statutory considerations, nearly all of them favor exercising jurisdiction. True, Maryland law governs Oyola's claims, and Maryland has a "distinct nexus" with Lafayette because it is based there. (Considerations 2 and 4, § 1332(d)(3)(B), (D)). But several thousand residents of Texas, California, Florida, and Virginia received notice, as well as residents of dozens of states (Ex. A ¶ 5), each putatively with their own common-law claim. This proves both that the claims are of national interest and that the number of Maryland citizens is not "substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States." (Considerations 1 and 5, § 1332(d)(3)(A), (E)). Nor has Oyola pleaded the class action "in a manner that seeks to avoid Federal jurisdiction," as he purports to represent a nationwide class spanning dozens of states. (Consideration 3, § 1332(d)(3)(C)). In sum, Oyola cannot meet the one-third citizenship threshold for the discretionary exception, and even if he had, the statutory considerations still counsel against remand.

Lacking any legitimate basis for abstention, Oyola seeks jurisdictional discovery "for the purpose of *possibly* being able to evidence the applicability" of one of the CAFA exceptions, but he completely fails to justify his request. (Doc. 10, pp. 15, 17, 19 (emphasis added)). Oyola concedes that jurisdictional discovery is appropriate *only where* two conditions are satisfied: (1)

"the existing record is inadequate to support . . . jurisdiction," and (2) "a party demonstrates that it can supplement its jurisdictional allegations through discovery." (Doc. 10, p. 15). Neither is satisfied here.

First, consistent with what the undersigned has repeatedly told Oyola's counsel, Lafayette's allegations in its Notice of Removal, Oyola's own allegations,[5] and now a declaration, only 20% of those who received notice of the Data Incident have Maryland addresses. (*See supra* p. 13). Because the existing record establishes that none of the CAFA exceptions applies, there is no need for jurisdictional discovery.

Regardless, Oyola's request for jurisdictional discovery is just a fishing expedition. He offers nothing beyond the conclusory assertion that "jurisdictional discovery is needed to determine class-member residency vis-à-vis the CAFA exceptions" and provides no reason to question Lafayette's allegations or evidence about where the notices were sent. (Doc. 10, p. 15). It is well established that a party must offer more than "speculation or conclusory assertions" to justify jurisdictional discovery. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). Where, as here, a party makes no "concrete proffer" of what jurisdictional discovery might uncover, and provides "no reason to believe" that additional information would alter the jurisdictional analysis, the Court is well within its discretion to deny jurisdictional discovery. *Id.* at 403; *see also Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory*, 283 F.3d 208, 216 n.3 (4th Cir. 2002) (affirming denial of jurisdictional discovery because "plaintiff simply want[ed] to conduct a fishing expedition in the hopes of discovering

---

[5] Oyola alleges that 9,108 residents of Texas were impacted (Doc. 1-2, p. 13), which alone is 12% of the putative class. He also alleges that residents of California—the most populous state—were impacted. (*See id.*). Nearly 7,000 residents of California received notice (Ex. A ¶ 5), which is another 9% of the class.

some basis of jurisdiction"); *McLaughlin v. McPhail*, 707 F.2d 800, 806 (4th Cir. 1983) (affirming denial of jurisdictional discovery where, "[a]gainst the defendants affidavits," plaintiff offered "nothing beyond his bare allegations").[6] Like *Sayre v. Westlake Servs., LLC*, No. 15-cv-687-ELH, 2015 WL 4716207 (D. Md. Aug. 7, 2015), the gist of Oyola's discovery request is that he wants to double check Lafayette's records himself. *Id.* at *9 (noting plaintiff had not "offered any evidence to cast doubt on the reliability of [defendant's] calculations" and "merely complain[ed] that she has not had an opportunity to verify his calculations by way of discovery"). But that does not justify "engag[ing] in a jurisdictional fishing expedition," especially where the same issues could be explored later "as part of the ordinary discovery process." *Id.*

### 3. The Court Should Deny Oyola's Request for Fees Because Lafayette Had an Objectively Reasonable Basis for Removal.

Even if the Court remands the case, there is no basis to award fees. "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c).  But "[t]here is no automatic entitlement to an award of attorney's fees." *Common Cause v. Lewis*, 956 F.3d 246, 256 (4th Cir. 2020). Far from it, courts may award attorney's fees "only where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005)). "And for a removal to be objectively unreasonable, it must be more than wrong." *Black v. Mantei & Assocs.*, 145 F.4th 528, 538 (4th Cir. 2025). This is a "high bar," to say the least, particularly in the Fourth Circuit but also elsewhere. *Alston v. Baltimore Gas & Elec. Co.*, No. 22-cv-1061-ELH, 2023 WL 1472020, at *30 (D. Md. Feb. 1, 2023); *see also Kenn v. Eascare,*

---

[6] Oyola's authority is not to the contrary. In his lead case, the Court ordered jurisdictional discovery only because it "c[ould not] decide if any CAFA exceptions apply without further information about the makeup of the proposed class." *Bryant v. GEICO Cas. Co.*, No. 22-cv-3310, 2023 U.S. Dist. LEXIS 77003, at *2 (D. Md. May 1, 2023). That is not true here.

17

*LLC*, 483 F. Supp. 3d 26, 37 (D. Mass. 2020) (noting that "many district courts have declined to award fees unless the facts are so one-sided as to have made remand a foregone conclusion" (cleaned up)).

Oyola has come nowhere close to showing that Lafayette lacked an objectively reasonable basis for removal. His complaint facially satisfies the elements of CAFA jurisdiction, which is the same jurisdictional basis asserted in the Consolidation Action. Without citing a single case in support,[7] Oyola nonetheless claims that he should be awarded fees because purportedly (a) Lafayette provided no "supporting evidence that the amount in controversy . . . exceeds $5 million and offered no evidence of the class members' citizenship," and (b) Lafayette's removal "was contradicted by" its previous arguments for dismissal. (Doc. 10, p. 20). Again, both miss the mark.

First, as explained above, it is blackletter law that a notice of removal "need not contain evidentiary submissions." *Dart*, 574 U.S. at 84; *accord Ellenburg*, 519 F.3d at 200 (stating that a "removing party's notice of removal sufficiently establish[es] jurisdictional grounds for removal by making jurisdictional allegations in the same manner" as a complaint)*; Acad. of Country Music*, 991 F.3d at 1068 ("[A] notice of removal need not contain evidentiary submissions but only plausible allegations of the jurisdictional elements." (cleaned up)). So the fact that Lafayette did not attach evidence to its Notice of Removal was not wrong at all, much less "more than wrong."

---

[7] Besides reciting the legal standard to award fees under § 1447(c), Oyola's entire argument boils down to two conclusory sentences with no case law. (Doc. 10, p. 20). The Court should deem his cursory request for fees waived for lack of development. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) ("It is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and perfunctory and undeveloped arguments are waived." (cleaned up)); *Horsetail Techs., LLC v. Del. State Police Fed. Credit Union*, No. 18-cv-556-ELH, 2020 WL 3402302, at *20 (D. Md. June 19, 2020) (stating "[u]ndeveloped and perfunctory arguments are deemed waived" and declining to consider argument that plaintiff "fail[ed] to expound on"). He has also failed to explain why he should be awarded fees if the Court remands based on CAFA defects instead of standing. So his request for fees applies only if the Court remands for lack of standing.

*See Black*, 145 F.4th at 538; *see also Diaz v. Ardagh Metal Beverage USA, Inc.*, No. 22-cv-00100-TLN, 2022 WL 3368537, at *2 (E.D. Cal. Aug. 15, 2022) ("[T]o the extent Plaintiff argues Defendant's notice of removal is deficient because it did not contain any evidence, the Court disagrees.").

Next, Lafayette's removal does not contradict its argument that the Consolidated Action should be dismissed for lack of standing. Lafayette maintains that all of the plaintiffs lack standing—but it acknowledges that the plaintiffs' contrary position in the Consolidated Action creates an open issue of law and thus provides a basis for removal. *See Common Cause*, 956 F.3d at 257 (affirming the denial of fees where "Defendants had an objectively reasonable—though weak and ultimately unsuccessful—basis for seeking removal"). Nothing requires a party to forego removal "simply because they *think* they *might* have a meritorious standing argument." *Ladies Mem'l Ass'n Inc. v. City of Pensacola*, 662 F. Supp. 3d 1212, 1218–19 (N.D. Fla. 2023) (denying fees). As another district court explained in denying fees on similar facts, "[t]o hold that Defendants' removal was objectively unreasonable would be to tell defense attorneys that they must leave a removable case in state court if they think a federal court might find the plaintiff lacks standing. That cannot be right." *Id.* Where, as here, the complaint facially satisfies the elements of CAFA jurisdiction, identically situated plaintiffs in a parallel action pending in federal court insist that they have standing, and the relevant case law is still evolving, it is objectively reasonable for a defendant to remove the case and seek a ruling on standing.[8]

---

[8] *See Bailey v. Spangler*, No. 14-cv-556, 2015 WL 5818215, at *3 (E.D. Va. Oct. 5, 2015) (holding that "[i]t is both common and objectively reasonable to ask a federal court to resolve the issue of standing following removal" and rejecting argument that "because [defendant] filed a motion to dismiss based on lack of standing immediately after removing the case to this Court, he could not have had a reasonable basis for removal"); *Barrientos v. Williams Sonoma, Inc.*, No. 21-cv-05160, 2023 WL 5720855, at *11 (N.D. Ill. Sept. 1, 2023) (denying fees where the "issue of [plaintiff's] standing was very much disputed" and "[i]n light of the evolving law, [plaintiff's] complaint—

More still, awarding fees in these circumstances would be contrary to the purpose of § 1447(c). Section 1447(c) strikes a careful balance between "the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter." *Martin*, 546 U.S. at 140. Oyola does not suggest, let alone argue, that Lafayette removed this case to needlessly prolong litigation or impose costs on him. *See, e.g.*, *Smith v. Westminster Mgmt., LLC*, 292 F. Supp. 3d 645, 649 (D. Md. 2018) ("Even if this Court had found that Defendants lacked an objectively reasonable basis for seeking removal, it would *still* consider the overall purpose of preventing dilatory and wasteful litigation tactics before finally deciding whether to award fees."); *Butler v. WP MD Propco I LLC*, No. 22-cv-00300-JRR, 2022 WL 2239604, at *2 (D. Md. June 22, 2022) (declining to award fees where defendants did "not oppose a motion to remand" and "removal was imprudent" but the court "[wa]s satisfied that it was not undertaken for any untoward or improper purpose; and . . . was not objectively unreasonable on its face"). Nor could he. *See supra* Argument Section 1.

## CONCLUSION

For the reasons above, Lafayette respectfully requests that the Court defer ruling on Oyola's Motion to Remand until it has ruled on standing in the Consolidated Action.

Dated: December 12, 2025                             Respectfully submitted,

                                                     By:    */s/ James Billings-Kang*
                                                            James Billings-Kang

---

including allegations of monetary harm, elevated risk of identity theft, and other intangible harms—is not devoid of any allegations of harm that could reasonably satisfy the Article III inquiry"); *cf. Emmett v. Citrix Sys., Inc.*, No. 25-0546, 2025 WL 1919561 (W.D. Pa. July 11, 2025) (finding defendant justified in removing copy-cat action where plaintiffs' Article III standing in related actions remained an open question).

COZEN O'CONNOR
2001 M Street NW, Ste. 500
Washington, DC 20036
T: (202) 280-6483
F: (202) 640-5936
JBillings-Kang@cozen.com
*Counsel for Defendant Lafayette Federal*
*Credit Union*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2025, I electronically filed the foregoing with the

Court's electronic filing system, which will send notice of such filing to all attorneys of record:

Arnold J. Abraham, Esq.                    Eric Menhart, Esq.
The CyberLaw Group                         Lexero Law
220 N. Liberty Street                      80 M Street SE, Ste. 100
Baltimore MD 21201                         Washington, DC 20003
Phone: (443) 906-3495                      Phone: 855-453-9376 Ext. 101
Abraham@TheCyberLawTeam.com                Eric.Menhart@Lexero.com


_/s/ James Billings-Kang_
James Billings-Kang